UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DANIEL R. SCHWARTZ,                    :
                                       :
        Plaintiff,                     :
                                       :
v.                                     :    Case No. 3:10-CV-0644 (RNC)
                                       :
GREGORY J. ANDERSON,                   :
CECILE L. BACCANALE,                   :
MICHAEL J. EAGEN,                      :
DONNA B. MUNROE,                       :
PETER J. NICHOLLS and                  :
RICHARD A. SIMONIELLO,                 :
                                       :
        Defendants.                    :

RULING AND ORDER

Plaintiff Daniel R. Schwartz brings this action pursuant to 42 U.S.C. § 1983 against six employees of the University of Connecticut ("UConn") alleging that his employment at UConn was terminated because he engaged in protected speech.  The defendants have moved for summary judgment principally on the grounds that the termination did not violate the First Amendment and they are entitled to qualified immunity.  I conclude that even if plaintiff's speech could be viewed as meriting protection under the First Amendment in one or more instances, a reasonable official in the defendants' position could think otherwise and thus they are entitled to qualified immunity as a matter of law.[1]

_____

[1] Defendants also rely on the applicable three-year statute of limitations, see Matthews v. Conn. Dep't of Pub. Safety, No. 3:10 Civ. 325 (MRK), 2010 WL 3984645, at *5 (D. Conn. Oct. 8, 2010), arguing that because this suit was filed in April 2010, only speech that occurred after April 2007 is actionable.  ECF

I. Background

The following account draws from the largely undisputed facts, with any contested points resolved in favor of the plaintiff.  The defendants are or were UConn employees connected with the university's animal research program.  At the relevant times, Gregory Anderson served as Vice Provost for Research and Graduate Education and Dean of the Graduate School; Cecile Baccanale directed UConn's Office of Animal Research Services ("OARS") (and supervised the plaintiff in his work between July 2007 and September 2008); Michael Eagen acted as a University Labor and Employment Specialist; Donna Munroe was UConn's Vice President for Human Resources and Payroll; Peter Nicholls was the Provost and Executive Vice President for Academic Affairs; and Richard Simoniello was the University's Program Director for Animal Care Services and Compliance.  ECF No. 39-2 at 1-2.

In 1995, plaintiff began working part-time as a veterinarian at a UConn animal research facility.  The following year he accepted a full-time position as an Attending Laboratory Animal Veterinarian.  Id. at 2.  As an Attending Veterinarian, his duties included diagnosing and treating sick and injured research animals, working with federal and state regulatory agencies to

---

No. 39-1, at 5.  For reasons that will be discussed in the text, none of the instances of speech that occurred prior to April 2007 provides a basis for recovery.  Accordingly, this decision rests on an evaluation of the merits of the claims and the defense of qualified immunity rather than the statute of limitations.

ensure compliance with law, developing programs to train staff, and advising his superiors and the University about any failures to meet regulatory standards.  ECF No. 42, Ex. 4.  In 1998, he became the first Director of the newly created OARS, a UConn office that performs scientific research using animals.  ECF No. 39, Ex. G at 20.

The parties agree that after 1998, plaintiff and his superiors were often at odds.  He was removed as Director of OARS in 2000.  Id.  In June 2001, the OARS Interim Director reviewed plaintiff's performance and found that although he was skilled in animal medicine, he was failing to discharge his duties in certain respects.  ECF No. 39, Ex. C:1.  The Interim Director indicated in a memorandum that plaintiff failed to meet regularly with other members of staff, did not consistently aid fellow workers in carrying out their responsibilities, and cultivated a "vindictive" and "unprofessional" attitude.  Id.  In 2002, Vice Provost Ian Hart wrote a letter to the plaintiff citing many of the same concerns and criticizing plaintiff's "apparent unwillingness to accept what is intended as constructive criticism."  ECF No. 39, Ex. C:3.  In the letter, Hart cautioned that "a second year of poor evaluations will cause us to seriously review your overall competency for the position of Attending Veterinarian."  Id.

After several years of relative calm, the relationship

between plaintiff and his employer began to deteriorate again.
In late 2005 or early 2006, OARS created a new job description
for plaintiff that decreased some of his responsibilities and
seems to have eliminated his duty to monitor OARS's compliance
with federal and state guidelines.  ECF No. 42, Ex. 5.  The next
month, defendant Anderson reprimanded plaintiff by letter after
he refused to provide a health certificate for laboratory mice
that UConn was shipping overseas.  The letter warned plaintiff
that "further similar incidents may result in disciplinary action
up to and including dismissal for cause."  ECF No. 39, Ex. C:7.
A similar communication followed in May, this time because
plaintiff had refused to assist a colleague who requested his
aid.  ECF No. 39, Ex. C:5.  Following these incidents, UConn
denied plaintiff a salary adjustment in August 2006, but its
decision was ultimately reversed after a union grievance.  ECF
No. 42-1 at 4.

     In December 2007, Anderson chastised plaintiff again, this
time for denying another veterinarian's request to euthanize a
rabbit, making an "untrue and disparaging remark about a
colleague" in an e-mail, and rebuffing superiors' requests to
work on weekends and holidays.  ECF No. 39, Ex. C:6.  The
following July, defendant Baccanale e-mailed defendant Eagen to
report that plaintiff had refused to tend to an injured mouse,
which threatened to compromise an important research project.

4

ECF No. 39, Ex. M.  (Plaintiff disputes the accuracy of this report.)  UConn placed plaintiff on paid administrative leave on July 29, 2008, and terminated his employment that September.  ECF No. 42-1, at 4.  Defendants state that plaintiff was fired because he had a long record of substandard performance and disagreeable behavior.

Plaintiff contends that UConn terminated his employment because he made a habit of notifying superiors and outside entities about serious problems within OARS.  He cites a number of e-mails and phone calls he initiated to various individuals, some affiliated with the University and some not, concerning such matters as the proper treatment of laboratory animals and the protocol for accessing controlled substances.  Plaintiff does not dispute that his superiors reprimanded him on a number of occasions between 1996 and 2008, but he asserts that they did so chiefly to retaliate against him for whistleblowing.  He identifies four complaints that occasioned retaliation by his superiors.

A. Drug Control Violations

Veterinarians at OARS used a number of controlled substances to treat research animals.  As a matter of protocol, both the drugs and a binder used to log their use were required to be kept under lock and key.  In June 2005, plaintiff became concerned that OARS employees were neglecting to comply with this

requirement.[2]  He therefore placed all of OARS's controlled
substances and the log book in a cabinet secured with a bicycle
lock.  ECF No. 39, Ex. J-4(1).  Plaintiff hid the key to the lock
and disclosed its location to no one but OARS Director Doug Stone
(his boss) and one other employee.  When Stone twice left the
cabinet unlocked and on another occasion permitted an employee
who was not listed on the drug registration to access the
controlled substances, plaintiff told Stone he was no longer
allowed to access the cabinet and hid the key in a new location.
Id.  Stone demanded to know where it was, and plaintiff e-mailed
the Drug Control Division of the Department of Consumer
Protection ("DCP") to ask for guidance.  Id.

    Plaintiff ultimately capitulated and gave Stone a key to the
bicycle lock.  But Stone soon left the records unsecured again.
Plaintiff e-mailed a supervisor, who forwarded the e-mail to
defendant Nicholls.  Nicholls's reply indicated that plaintiff
had acted properly in contacting DCP and suggested that he should
alert the University Police if he suspected criminality.  Id.

B. Drug Registration Violations

    OARS's state registration placed restrictions on the
facility's use of controlled substances.  OARS was not permitted
to distribute drugs to other laboratories, and only employees

---

    [2]At that time plaintiff was one of the veterinarians listed
on OARS's controlled substance registration, which was filed with
the State of Connecticut.

listed on its registration were allowed to access controlled
substances.  ECF No. 39, Ex. J-4(2).  In February 2007, plaintiff
noticed that the log book indicated that OARS had distributed
drugs to another laboratory the previous May.  He responded to
the violation with an e-mail to Eagen and defendant Munroe,
neither of whom initiated an investigation.  Id.

On July 20, 2007, plaintiff noticed another violation.  An
Animal Care Manager named Teresa Samuels had placed her initials
in the controlled substances log even though she was not listed
on the current registration.  (At that time, the registration was
under the name of defendant Simoniello.)  Id.  Plaintiff called a
DCP agent, Gerald DeStefano, to find out whether Samuels was
authorized to access drugs.  No investigation followed.
Plaintiff alleges, however, that his superiors learned about his
contact with DCP: the agenda for a September 2007 meeting between
Anderson and Nicholls lists as an item "Consumer Protection
Agency - Senior Drug Control Agent meeting Thursday Whistle
Blowers Policy - Schwartz."  Id.

A similar incident occurred in May 2008.  After seeing
Samuels's initials on the drug log, plaintiff alerted DeStefano.
Some time later, DeStefano told plaintiff that the DCP deals with
such incidents by contacting the licensee, informing the licensee
of the complaint, and "remedy[ing] the complaint in the least
intrusive manner possible."

7

C. Rabbit Euthanasia

On July 11, 2007, Baccanale sent plaintiff an e-mail asking him to euthanize three rabbits using a drug called Euthasol. Instead of performing the procedure, plaintiff prepared a response arguing that carbon dioxide gas is an acceptable agent for euthanizing rabbits.  ECF No. 39, Ex. K.  In his e-mail, plaintiff discussed statements from various research protocols that call for the use of carbon dioxide to euthanize pregnant rabbits unable to deliver their young.  (Neonates evidently resist the effects of carbon dioxide better than adults, so an adult female may be euthanized with carbon dioxide without harming her young.  The researcher can then collect the neonates.)  Plaintiff pointed out that none of the cited research protocols explicitly forbade the use of carbon dioxide as a euthanasic on non-pregnant rabbits.  Id.  Plaintiff did not make clear in the e-mail precisely why he preferred to use carbon dioxide instead of Euthasol; he simply asserted that euthanasia by carbon dioxide was permissible.  Plaintiff sent the response to Baccanale two hours after she had asked him to euthanize the rabbits.  He directed a copy to a representative of the Institutional Animal Care and Use Committee ("IACUC"), a University body responsible for reviewing OARS policies concerning the humane care and treatment of animals.  Id. Plaintiff attached to his e-mail a copy of the Euthasol label (a

two-page document summarizing indications, directions, and warnings concerning the drug).  Id.

Following this incident, Anderson accused plaintiff of insubordination for failing to promptly euthanize the rabbits as Baccanale had directed.  ECF No. 39, Ex. J-4(4).  Plaintiff argued then and argues now that "as a board-certified laboratory animal veterinarian" he was responsible for "read[ing] the research protocol and document[ing] his concerns before assisting in the planned experimental procedure."  Id.  One University professor copied on plaintiff's response understood him to be raising "an animal welfare question" but responded by reminding him of the need to avoid delaying scheduled procedures.

D. Complaints to the Office of Audit, Compliance and Ethics ("OACE")

On May 7, 2008, plaintiff sent an e-mail to the University's OACE, a body charged with ethical oversight of OARS.  The e-mail ran six single-spaced pages and comprised a litany of complaints about OARS and plaintiff's supervisors as follows:

- Plaintiff complained about OARS Director Doug Stone.  ECF No. 42, Ex. 8, at 2.  He charged that Stone had regularly left controlled substances unsecured and had unjustly  accused plaintiff of insubordination.  Moreover, plaintiff stated, Stone had received credit for helping UConn achieve its first citation-free USDA inspection in years, when in truth the University had accomplished that goal before Stone started working there.  Id.

9

- Plaintiff argued that he had not been at fault in the various incidents that marred his employment record.  He argued, for instance, that he had been justified in refusing to certify a shipment of mice for transport overseas.  Plaintiff wrote, "I think it is wrong to require I write health certificates when the 'University' no longer pays for my licenses."  <u>Id</u> at 3.

- Plaintiff recounted the controversy surrounding the proper way to euthanize rabbits and alleged that he had been accused of insubordination after the incident.  He pointed out that, apparently because of such occurrences, he had not been given work commensurate with his abilities.  <u>Id</u>.  Instead, his supervisors had targeted him and blocked his advancement within OARS.

- Plaintiff argued that his supervisors were unfit for their positions.  Baccanale, for instance, was hired by "a rigged search committee" and was "not a board-certified veterinarian." <u>Id</u>.  Simoniello was "adept at self-promotion and discrediting others," but plaintiff knew "of no other director of an animal care program with as little credentials."  <u>Id</u>. at 6.  Plaintiff asserted that his clinical bona fides surpassed those of Stone or Baccanale and that Simoniello was his superior even though "several other OARS staff members including [plaintiff] [were] certified at a higher level."  <u>Id</u>.

- Plaintiff objected to a change in OARS's policies

10

regarding outside consulting.  Before Stone, Anderson, and Baccanale had begun working at UConn, plaintiff had done consulting work for other animal-care facilities in Connecticut on University time.  Id. at 4.  But in 2006, he had been told to restrict that work to personal or vacation time.  Id.

- Finally, in a set of numbered paragraphs labeled "Additional Concerns," plaintiff identified various lesser issues.  Baccanale, for instance, often failed to include sufficient information in her e-mails and sometimes omitted to respond to messages.  Id. at 5.  In 2008, she dismissed three technicians without cause.  And when Baccanale was hiring veterinary technicians, she never sought plaintiff's opinions. Id.

Plaintiff closed his May 2007 e-mail by offering to transfer to a new position "for a fair salary" if he could work under "a board-certified Director who honestly present [sic] his or her degree(s) and credentials and who has respect for and treats staff and others fairly."  Id. at 7.

Attached to the May 2007 e-mail was another e-mail that plaintiff had sent to Anderson in December 2005.  In the December 2005 e-mail, plaintiff had requested reinstatement of his job title and responsibilities as Attending Veterinarian with membership on the Institutional Animal Care and Use Committee (IACUC).  Id. at 8.  The e-mail argued, in essence, that

plaintiff had been demoted because of USDA violations within OARS that occurred when he was Attending Veterinarian, but for which he was "in no way accountable." Id. Under his watch, the e-mail stated, OARS had been "well on the way to better compliance" before Doug Stone arrived. Yet Stone had received credit for reforming OARS policies to conform with federal regulations. Id. The e-mail stated that after losing his job title, plaintiff had found it difficult to obtain leave and spent too many days on call.

Plaintiff sent another e-mail on June 5, this one to OACE member Kimberly Fearney. Plaintiff thanked Fearney for meeting with him about his May 7 e-mail[3] and stated that he was "dealing with a pattern of behavior by my supervisors including their fabrication of accusations, false investigations, nasty letters, and inaccurate reports." ECF No. 42, Ex. 6 at 1. He suggested that Fearney "look into" a number of reports and reviews that, he said, documented his mistreatment.

Defendant Nicholls, who was copied on the June 5 e-mail, forwarded it to defendants Eagen, Munroe, and Anderson. He added, "I think you all need to be aware that this individual is engaged in these sorts of discussions with Kim Fearney." Id.

Plaintiff e-mailed Fearney one final time on June 21. He

---

[3]The record does not disclose when this meeting occurred or what was discussed.

told Fearney that he had been called into work because the mice in two cages had become dehydrated and tried to eat each other. He indicated that the cages' Autowater systems failed under certain circumstances and that OARS probably had too few technicians to properly monitor the mice.  ECF No. 42, Ex. 9 at 1.

Plaintiff was placed on administrative leave a month after this last e-mail message and his employment was terminated in September.[4]  He then filed this suit under 42 U.S.C. § 1983, alleging that the defendants violated his First Amendment rights by retaliating against him because of his protected speech.[5]

II. Legal Standards

On a motion for summary judgment, the Court's role is to identify triable issues, not to try them.  Summary judgment is proper only if "the movant shows that there is no genuine dispute

---

[4]Shortly thereafter, he filed an administrative complaint before the Connecticut Commission on Human Rights and Opportunities.  He won a damages award on the ground that his superiors had retaliated against him by failing to return his personal belongings after his termination.  See Eagen v. Comm'n on Human Rights & Opportunities, 135 Conn. App. 563 (2012). Neither party argues that the administrative proceeding bears at all on this one.

[5]Plaintiff emphasizes that the defendants foresaw this action when they terminated his employment.  In a July 28, 2008 e-mail from Eagen to Munroe, Eagen stated that plaintiff's dismissal "might trigger a retaliation claim in state or federal court (whistleblower or free speech presumably) that would focus on UCONN's animal care program and Dan's alleged vigilance in speaking out about flaws, etc."  ECF No. 56, Ex. 1 at 15.

as to any material fact and the movant is entitled to judgment as
a matter of law." Fed. R. Civ. P. 56(a).  A "material" fact is
one that might influence the case's outcome under governing
substantive law, and a "genuine" dispute is one in which the
evidence would permit a reasonable jury to find for the party
opposing the motion.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 247-48 (1986).  A motion for summary judgment tests the
nonmoving party's evidence rather than its bare allegations or
denials, but the Court resolves all ambiguities and draws all
reasonable inferences in the nonmovant's favor.  <u>Gallo v.
Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1223
(2d Cir. 1994).

To prove his First Amendment retaliation claim under § 1983,
plaintiff must show "(1) that the speech at issue was protected,
(2) that he suffered an adverse employment action, and (3) that
there was a causal connection between the protected speech and
the adverse employment action."  <u>Nagle v. Marron</u>, 663 F.3d 100,
105 (2d Cir. 2011).  Because this case involves speech by a
government employee, the speech at issue was not protected unless
plaintiff spoke as a citizen on a matter of public concern.  <u>See
Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006).  Even when both
requirements are satisfied, government officials may restrict
employee speech if it has the potential to disrupt operations.
<u>Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will</u>

14

Cnty., 391 U.S. 563, 572–73 (1968).

Whether a government employee is speaking as a citizen or as part of his job depends primarily on the nature of his duties. The "controlling factor" is whether the employee is speaking "pursuant to duties." Garcetti, 547 U.S. at 421.  But this requires analysis beyond mere consideration of the employee's written job description; "the proper inquiry is a practical one." Id. at 424.  Speech that occurs at work or that is directed to a superior might be less likely to be protected, but this factor is not dispositive.  Neither is it conclusive that the speech concerns the subject matter of employment.  Id. at 420.  If in all the circumstances the employee speaks because that is "what he . . . [is] employed to do," the government as employer may properly control what he says.  Id. at 421.  If not, he is speaking as a citizen and the government's power to curb his expression is strictly limited.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147–48.  Speech is more likely to concern the public if "addressed to a public audience," United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 466 (1995), but speech made in private can qualify too.  See Rankin v. McPherson, 483 U.S. 378, 381 (1987).  If the employee's motivation for speaking is to inform

15

the public, a court is more likely to hold that it is on a matter of public concern.  See Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991).  Even a purely personal agenda, however, is not conclusive the other way.  Huth v. Haslun, 598 F.3d 70, 74 (2d Cir. 2010).  Government employees can provide valuable information of concern to the public regarding the operation of the institutions for which they work, see Pickering, 391 U.S. at 569-70, but not every employee complaint is protected by the First Amendment.  Brtalik v. S. Huntington Union Free Sch. Dist., No. 10 Civ. 0010, 2010 WL 3958430, at *7 (E.D.N.Y. 2010).

As in many First Amendment retaliation cases brought by government employees, the defendants rely on the affirmative defense of qualified immunity.  Under § 1983, a government officer is immune from suit in his personal capacity except for conduct that violates clearly established law.  An official violates clearly established law only when, "at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011).  The doctrine of qualified immunity attempts to give officials confidence to act firmly in gray areas by penalizing only those who cross clear lines.  In employee-speech cases, where constitutional boundaries are often "blurry," qualified immunity is frequently a difficult barrier for

16

plaintiffs.  See Stickley, 416 Fed. Appx. at 272.

Plaintiff contends that qualified immunity is categorically unavailable in this case because he alleges "retaliatory animus." "If the defendants' motivation is found to be retaliatory in nature," plaintiff asserts, "qualified immunity is inappropriate."  ECF No. 56 at 11.  It is not clear what the plaintiff means by "retaliatory animus" or "retaliatory motive." It appears, though, that he uses these terms to mean something like, "with the intent to punish the plaintiff because of the content of his speech."

In arguing that evidence of retaliation bars the qualified immunity defense, plaintiff relies on Locurto v. Safir, 264 F.3d 154 (2d Cir. 2001).  In Locurto, a New York City police officer helped build a racist float for a Labor Day parade and rode on the float through Queens.  Locurto, 264 F.3d at 159-60.  He was fired and brought suit under § 1983 on the theory that the City had retaliated against him for exercising his First Amendment freedoms.  The case therefore presented a Pickering question. The City conceded that the officer had spoken on a matter of public concern.  (There was no doubt he had spoken as a citizen and not as an employee.)  Id. at 168.  But it argued that it could justify the officer's firing under Pickering's second prong because the speech so threatened to disrupt the workplace that discharge was permissible even though the plaintiff had spoken as

17

a citizen on a matter of public concern.  Id.  In response, the
plaintiff argued that the City had not in fact fired him because
it feared his speech would disrupt governmental operations; its
real objection was to the content of his speech.  The City took
the position that, for two reasons, its actual motivation was
irrelevant.  First, what mattered was whether a reasonable
official could have determined that the plaintiff's speech was
likely to disrupt the workplace, not whether any officials
actually did make that determination.  Second, it argued,
questions of subjective intent are *per se* irrelevant to the
qualified immunity inquiry.  For this proposition it cited Harlow
v. Fitzgerald, 457 U.S. 800 (1982).

        The Court of Appeals rejected both arguments.  In so doing
it wrote, "[W]here subjective intent is actually an element of
the plaintiff's claim as defined by clearly established law, it
can never be objectively reasonable for a government official to
act with the intent that is prohibited by law."  Locurto, 264
F.3d at 169.  The question raised by plaintiff's argument in the
present case is what this language means.  Plaintiff says it
precludes qualified immunity whenever the government fires an
employee over the content of speech.  For three reasons,
plaintiff's reading of the Court's language in Locurto is not
correct.

        First, plaintiff's argument wrenches the Court's language

from context.  As just discussed, the Court was responding to two
specific arguments advanced by the City.  The first concerned
Pickering's second prong, which balances the government's
interest in maintaining an efficient workplace against an
employee's interest in speaking freely.  In relation to this
argument, the Court recognized that the government may fire an
employee whose speech threatens to disrupt operations, but only
if it actually believes the speech will be disruptive.[6]  The
second argument the Court addressed was the City's reliance on
Harlow for the proposition that questions of subjective intent
are irrelevant at the qualified immunity stage.  Id. at 169.  The
Court pointed out that under Crawford-El v. Britton, 523 U.S. 574
(1998), qualified immunity analysis must address issues of
subjective intent when the underlying constitutional tort
contains an intent element.  Crawford-El, 523 U.S. at 593.
Locurto, then, does not support the novel rule plaintiff suggests
here.

Second, plaintiff's argument is contrary to Crawford-El,
which is the Supreme Court's latest statement on the intersection
of qualified immunity and intent-based constitutional torts.  In
Crawford-El, the Court was asked to alter the qualified immunity

---

[6]This is another way of saying that when the government does
not in fact think that protected employee speech will disrupt
operations, it has no interest in disallowing the speech and thus
cannot prevail in the Pickering balancing test.

inquiry in cases involving substantive claims with subjective
elements.  The argument was that questions of intent too often
prevent courts from disposing of such claims on summary judgment.
Id.  The Court declined to fashion a new rule but took care to
explain that even intent-based claims are often susceptible to
the qualified immunity defense.  When the law concerning the
*objective* elements of a motive-based claim is not clearly
established, wrote the majority, summary judgment on
the ground of qualified immunity is proper:

> Even when the general rule has long been clearly
> established (for instance, the First Amendment bars
> retaliation for protected speech), the substantive
> legal doctrine on which the plaintiff relies may
> facilitate summary judgment in two different ways.
> First, there may be doubt as to the illegality of the
> defendant's particular conduct (for instance, whether a
> plaintiff's speech was on a matter of public concern).

Id.  Plaintiff's argument runs headlong into this principle,
which also appears prominently in Locurto.  See 264 F.3d at 168
("The Supreme Court has suggested that a First Amendment
retaliation claim may prove susceptible to summary judgment in
appropriate cases based on the absence of elements from a
plaintiff's threshold showing, such as whether the speech was on
a matter of public concern . . . .").

Finally, in light of the substantive law of government
employee speech, plaintiff's argument goes too far.  It is odd to
talk about "retaliatory motive" or "unlawful animus" in cases in

20

which it is not clear that the speech was made in the employee's
capacity as a citizen on a matter of public concern.  Every
firing based on something an employee has said is "retaliatory"
in the sense that it results from the employer's disapproval of
the statement.  <u>Pickering</u> stands for the principle that when the
government acts as an employer instead of as a regulator, it
should have some latitude to fire its employees because of the
things they say.  Put another way, unless an employee speaks as a
citizen on a matter of public concern, a "retaliatory motive"  is
not necessarily a bad thing, at least as far as the Speech Clause
is concerned.  It would therefore be strange if such a motive,
without more, affected the constitutional calculus.

In sum, plaintiff's evidence of "retaliatory animus" does
not affect the qualified immunity inquiry with respect to the
objective elements of the alleged constitutional tort.  As in any
qualified immunity case, the question will turn on whether the
defendants' actions were plainly illegal under clearly
established law.

III. <u>Discussion</u>

Plaintiff has identified four instances of allegedly
protected speech.  Defendants argue that none of the speech was
protected because in each instance plaintiff spoke as an
employee, not as a citizen, and because his speech did not touch
on matters of public concern.  They also argue that even if a

21

jury could find that plaintiff spoke as a citizen on a matter of
public concern, they are nonetheless entitled to qualified
immunity as a matter of law because it would not have been clear
to a reasonable official that the speech was protected.

A. Drug Control Violations

During the summer of 2005, plaintiff e-mailed the
Connecticut DCP to ask for advice about how to respond to Stone's
failure to secure the controlled substances cabinet.  He also e-
mailed a supervisor about the same issue.  This speech was not
protected by the First Amendment because plaintiff was speaking
pursuant to his duties as an employee.  At that time, plaintiff
was an Attending Veterinarian and a member of the IACUC.
According to his formal job description, he was responsible for
"advis[ing] OARS, administration, IACUC, faculty, and researchers
on all issues of noncompliance with USDA, PHS, and AAALAC
guidelines."  ECF No. 42, Ex. 4.  He was also listed as the
registrant on OARS's drug registration.  The parties agree that
as the registrant, he was charged by law with reporting
violations of protocol to DCP.  See Conn. Gen. Stat. § 21a-262;
ECF No. 50 at 4-5.  This evidence strongly suggests that when he
called the DCP and e-mailed his supervisors, he was discharging
his duties as an employee rather than acting as a concerned
citizen.

Plaintiff does not dispute this conclusion.  Indeed, his

22

argument that not all of his speech was made in his capacity as
an employee relies heavily on the change in his job description
that occurred in late 2005 or early 2006.  Concerning that shift
in his responsibilities, plaintiff asserts:

> Defendants Anderson and Munroe adopted a job
> description to ensure that addressing violations and
> filing complaints would not be part of the plaintiff's
> job responsibilities. . . . Upon Dr. Stone's departure
> . . . Anderson and Munroe expended great effort and
> much expense in hiring outside consulting Attending
> Veterinarians to ensure that addressing animal welfare
> violations and that [sic] filing complaints were not
> pursuant to the plaintiff's job responsibilities . . .
> .

ECF No. 50 at 4; see also ECF No. 42 at 9 (admitting that "[t]he
job description of Clinical Veterinarian, which the defendants
put in place for the plaintiff as of February 6, 2006 . . .
specifically omitted [plaintiff's previous] regulatory oversight
responsibilities.").  Plaintiff concedes that he was the
registrant listed on OARS's registration until January 2006 and
relies on the change to argue that he was not responsible for
reporting violations that occurred in 2006 or later.  ECF No. 39,
Ex. J-4(2).  Both changes – the reformulation of his job
description and the end of his tenure as registrant – occurred
some four months after his last complaint about drug control
violations.

In light of plaintiff's formal job description and his
concessions concerning the changes to his responsibilities after
he complained to DCP and to his supervisor, it must be concluded

that in this instance he spoke as an employee rather than as a citizen. His complaints were therefore not protected under Garcetti.

Moreover, the defendants are entitled to qualified immunity concerning this speech because it would not have been clear to a reasonable official in their position that plaintiff spoke on a matter of public concern. Plaintiff has not even attempted to identify a case sufficiently similar to this one to put the defendants on notice that plaintiff's speech was protected and their action illegal. Instead, he simply asserts that "compliance for controlled drug substances" is an issue of "heightened public concern." ECF No. 56 at 4.

The issue, however, is not whether the broad topic of controlled-substance regulation is a matter of public concern. Of course it is. What matters is whether, in all the circumstances, the "content, form, and context" of these particular complaints suggests that they merit protection. See Connick, 461 U.S. at 147.[7] A review of the case law shows that even if the speech was protected (which I need not decide), it

---

[7]In Ezekwo, for instance, the plaintiff complained about discrimination based on race and gender. That general topic undoubtedly concerns the public, but the Second Circuit concluded that her particular speech did not. Ezekwo, 940 F.2d at 778, 781; see also Connick, 461 U.S. at 148 n.8 ("The dissent's analysis of whether discussions of office morale and discipline could be matters of public concern is beside the point— it does not answer the question whether *this* questionnaire is such speech.").

would not have been clear to a reasonable official in the
defendants' position.

First, an official assessing the content of these complaints
could have justifiably concluded that they were not protected.
Plaintiff basically called attention to three occasions on which
employees failed to secure a cabinet containing controlled
substances and a log book.  Though Second Circuit precedent
establishes that speech exposing "pervasive or systemic
misconduct by a public agency or public officials" relates to a
matter of public concern, plaintiff's complaints did not address
such extensive malfeasance.  Saulpaugh v. Monroe Comm. Hosp., 4
F.3d 134, 143 (2d Cir. 1993) (quoting Yatvin v. Madison Metro
Sch. Dist., 840 F.2d 412, 420 (7th Cir. 1988)).  Nagle
illustrates the point.  In that case, the plaintiff alleged that
she had been fired because she reported that her boss had forged
her signature on a document.  Nagle, 663 F.3d at 107-08.
Forgery, as the court noted, is a crime, and in some general
sense the public should and does care about criminal behavior by
public servants.  But the court held that absent some indication
that the plaintiff was trying to address widespread misbehavior
or egregiously poor judgment by an official, the speech was not
protected.  Id.  A reasonable official who had read these cases
and assessed plaintiff's complaints could reasonably have
concluded that they touched on isolated instances of carelessness

25

by his colleagues instead of "pervasive or systemic misconduct" and were therefore not on a matter of public concern.

Neither does the form or the context of plaintiff's complaints suggest that they are protected.  Though speech "does not have to be public in order to be protected as a matter of public concern, the choice of forum for the speech is relevant to the inquiry."  Rambaldi v. City of Mount Vernon, No. 7:01 Civ. 03648 (GAY), 2003 WL 23744272, at *8 (S.D.N.Y. Mar. 31, 2003) (holding that an employee's speech was on a matter of public concern in part because the speech was published in a local newspaper).  That plaintiff directed his speech only to his superiors and to an enforcement agent (as was required of him by law) suggests that it was not protected.

Qualified immunity ensures that public officials will be personally liable only for crossing obvious lines.  Nothing in the case law establishes that plaintiff's complaints about drug control violations were obviously protected speech.  Rather, cases like Saulpaugh, Nagle, and Rambaldi suggest the opposite conclusion.  The defendants therefore enjoy the protection of qualified immunity.

B. Drug Registration Violations

In 2007 and 2008, plaintiff notified his superiors and the DCP that OARS had distributed drugs to another laboratory and that unregistered employees were accessing controlled substances.

Apparently in response, Anderson and Nicholls scheduled a meeting with the agenda item, "Consumer Protection Agency - Senior Drug Control Agent meeting Thursday Whistle Blowers Policy - Schwartz." ECF No. 39, Ex. J-4(2). Disputes of material fact preclude the determination that plaintiff made these complaints as an employee, but the defendants are entitled to qualified immunity because it is not clear that the complaints were on a matter of public concern.

The question whether plaintiff spoke as an employee on these occasions cannot be resolved as a matter of law. Plaintiff supports the argument that he spoke as a citizen by pointing to his shift in responsibilities in late 2005 or early 2006, after which his written job description no longer made mention of compliance or reporting duties. He also points out that OARS's drug registration did not include him as a registrant after January 2006, and argues that this terminated his obligation to report drug violations to DCP. Defendants respond with an affidavit from Baccanale stating that every OARS employee, including plaintiff, was responsible for reporting compliance issues. ECF No. 39, Ex. B at 2. This dispute concerning plaintiff's duties at the pertinent time raises a triable issue of fact. A reasonable jury could infer from the language of plaintiff's 2006 job description that his employers meant to eliminate his compliance responsibilities entirely, and it could

27

decide not to credit Baccanale's affidavit.  A jury also could reasonably find the other way.

However, the defendants are entitled to qualified immunity regarding these complaints.  Plaintiff argues that his speech touched on matters of public concern because it involved the illegal use and distribution of drugs.  But his argument ignores the proper inquiries: whether the content, form and context of the speech show it was protected, and whether the case law established this sufficiently clearly to overcome the defense of qualified immunity.  Plaintiff's argument fails because in this instance his speech concerned infrequent breaches of administrative protocol instead of "pervasive or systemic misconduct."  Saulpaugh, 4 F.3d at 143 (2d Cir. 1993) (quoting Yatvin, 840 F.2d at 420 (7th Cir. 1988)).  Indeed, in this instance the DCP's response to his grievances demonstrates that the matters plaintiff reported were reasonably viewed as relatively minor.  The agent who handled the plaintiff's complaints told him that the proper remedy was to contact the offending official, tell him about the allegation, and "remedy the complaint in the least intrusive manner possible."  ECF No. 39, Ex. J-4(2).  This apparent lack of concern bolsters the conclusion that a reasonable official in the defendants' position could conclude that plaintiff's complaints did not merit protection.

28

In resisting this conclusion plaintiff relies heavily on the Anderson-Nicholls meeting agenda.  He argues that the defendants must have known that his speech was protected because they "literally identified the plaintiff as a whistleblower."  ECF No. 56 at 3.  The first problem with this argument is that its factual premise is false.  The meeting agenda does not "literally identif[y] the plaintiff as a whistleblower."  It simply indicates that the defendants discussed plaintiff in connection with UConn's "Whistle Blowers Policy."  Only a foolish official would discipline an employee who had complained to a state agency without regard for institutional policy or governing law.

Moreover, as has been discussed, the defendants' subjective understandings are not relevant to the question whether plaintiff's right to speak was clearly established.  Plaintiff's argument in this respect must rest on case law clearly establishing that he spoke on a matter of public concern, not discovery materials showing that Anderson viewed him as a whistleblower.  Plaintiff cites no such case law.  Defendants are therefore entitled to qualified immunity on this part of the case.

C. Rabbit Euthanasia

In July 2007, plaintiff sent an e-mail to Baccanale and members of the IACUC arguing that carbon dioxide gas can be used to euthanize non-pregnant rabbits.  Plaintiff did not indicate in

the e-mail why he preferred carbon dioxide to Euthasol, the agent Baccanale had directed him to use.  One IACUC member initially thought plaintiff was unable to access Euthasol but later suggested that the question concerned "animal welfare."  ECF No. 39, Ex. K.  Defendants argue that the e-mail was not protected speech because plaintiff sent it in his capacity as an employee and that they are entitled to qualified immunity because it was not clear that plaintiff was addressing a matter of public concern.  I agree.

In the summer of 2007, plaintiff's duties as a Clinical Veterinarian included "provid[ing] veterinary care . . . and administer[ing] drugs as needed."  ECF No. 42, Ex. 5.  His opinion about which drugs could appropriately be used to induce death in rabbits was "part-and-parcel of his concerns about his ability to properly execute [those] duties."  Weintraub v. Bd. of Educ. of the City of New York, 593 F.3d 196, 203 (2010) (internal quotation marks omitted).  This conclusion is reinforced by the e-mail's scientific bent: it cites a number of research protocols, discusses the active principles in Euthasol, and reproduces the Euthasol label.  The communication is part of a technical discussion among veterinarians about how best to perform their jobs.  Moreover, plaintiff's own admissions show that he believed he was acting pursuant to duty when he e-mailed the IACUC.  In a response to interrogatories from the defendants,

plaintiff wrote of the rabbit euthanasia controversy:

> [I]n July 2007, Schwartz was again targeted for
> termination for 'insubordination' in regards to a
> rabbit euthanasia incident. . . . On the
> insubordination charge, Anderson repeatedly asked why
> Schwartz did not immediately do as Baccanale emailed on
> July 11, 2007 from her adjacent office and Schwartz
> repeatedly responded that as a board-certified
> laboratory animal veterinarian Schwartz must read the
> research protocols and document his concerns before
> assisting in a planned experimental procedure.

ECF No. 39, Ex. J-4(4).  In other words, when plaintiff
"document[ed] his concerns" in his e-mail, he thought he was
simply doing his job.  The speech therefore "owe[d] its existence
to [his] professional responsibilities" and provides no basis for
a First Amendment claim.  Garcetti, 547 U.S. at 421; see also
Anemone v. Metro. Transp. Auth., 629 F.3d 97, 116 (2d Cir. 2011)
(holding that an employee's speech was not protected in part
because the employee "testified that as Director of Security at
the MTA, he . . . viewed cooperating with [District Attorneys'
offices] as among his duties").

    In any event, the defendants are entitled to qualified
immunity concerning this speech because a reasonable official
could have concluded that plaintiff's e-mail was not on a matter
of public concern.  Plaintiff argues otherwise on the ground that
his message was about "animal welfare."  I have no doubt that
questions about the care and treatment of animals used for
research concern the public.  See, e.g., Rambaldi, 2003 WL

23744272, at *8 (holding that an allegation of animal abuse published in a newspaper was speech on a matter of public concern).  But this case concerns the plaintiff's e-mail, not animal welfare as a general topic.  And a reasonable official assessing the content, form and context of plaintiff's message could have concluded that it did not touch on a matter of public concern.

As discussed, the content of the e-mail chiefly concerns technical questions about veterinary care, not issues relating to the humane treatment of animals.  Indeed, the message nowhere suggests any concern about the rabbits' well-being.  It devotes itself entirely to the interpretation of various research protocols and the argument that carbon dioxide is a scientifically viable agent for euthanizing a rabbit.  People who received the message initially thought that plaintiff had sent it because he was unable to access Euthasol; only later did one suggest that his concern was "animal welfare."[8]  ECF No. 39, Ex. K.

The form and the context of the e-mail also indicate that it did not relate to matters of public concern.  Plaintiff directed his speech to supervisors within the University, not to the

---

[8] The record does not indicate why this employee came to think that the plaintiff was concerned about the rabbits' welfare.  If Schwartz engaged in other speech after his e-mail that made this purpose clear, that speech is not in evidence.

public at large.  He "did not seek to inform the public,"
Connick, 461 U.S. at 148, but to discuss a matter of veterinary
protocol with his professional colleagues.  Moreover, the context
in which he sent the e-mail weighs against the conclusion that it
concerned the public.  In his response to an interrogatory,
plaintiff indicates that he e-mailed the IACUC because Baccanale
had recently determined to use Euthasol to euthanize rabbits and
had tried "to force [him] to change procedures without first
notifying the animal care committee."  ECF No. 39, Ex. J-4(4).
Viewed in light of this response, plaintiff's e-mail is
reasonably viewed as a light rebuke of Baccanale's choice of
Euthasol based on considerations of science and protocol.  There
is no indication that it was part of a larger effort to address
animal-welfare concerns within OARS.

        I need not decide whether the tangential connection between
this e-mail and the humane care of animals brings the speech
within the ambit of the First Amendment.  Qualified immunity
defeats recovery in any case.  Plaintiff has not cited a single
case indicating with any clarity that his speech was protected.
To be sure, some Pickering cases involve speech about the care
and treatment of animals, but none is remotely similar to this
one.  Rambaldi is probably the closest case from within the
Second Circuit.  In Rambaldi, the plaintiff complained about an
animal shelter's "animal abuse and needless euthanasia" to "City

officials, the Mayor and to the press." Rambaldi, 2003 WL
2374427, at *8.  Her complaints were "published in numerous local
newspaper articles."  Id.  The court held that this speech was on
a matter of public concern.

Rambaldi is a long way from this case.  There, the speech's
content (direct allegations of "animal abuse"), form (complaints
to politicians and to newspapers) and context (a long campaign
directed toward obtaining relief for the animals) all weighed
heavily for protection.  Here, as discussed, all three factors
militate in the opposite direction to such an extent that
Rambaldi could not have indicated to a reasonable official that
plaintiff was speaking on a matter of public concern.[9]

D. OACE Complaints

In May and June of 2008, plaintiff sent three e-mails to
OACE.  The first two are similar in content and can be considered
together.  The third, which concerns problems with OARS's
laboratory cages, must be analyzed separately.

1. The May 7 and June 5, 2008 E-mails

The content of these e-mails is described in detail in Part

---

[9]Even if Rambaldi could reasonably be read to clearly
indicate that plaintiff spoke on a matter of public concern, it
would not be enough for the plaintiff.  Rambaldi is not a Second
Circuit case – indeed it is not even a District of Connecticut
case – and is therefore by itself insufficient to defeat
qualified immunity.  See Ashcroft v. al-Kidd, 131 S. Ct. 2074,
2084 (2011) (noting that only "controlling authority," or a
"robust consensus of cases of persuasive authority," suffices to
"clearly establish" the law).

I.D., *supra*, and need not be repeated here.  Basically, the e-mails explained why plaintiff had not been at fault in the drug registration and rabbit euthanasia incidents, argued that his superiors were incompetent, and asserted that his title and perquisites were not commensurate with his abilities.  In a December 2005 e-mail that accompanied the May 7 e-mail, plaintiff had asked to be reinstated as an Attending Veterinarian.  In the May 7 e-mail, he asked to be transferred so that he could work under new supervisors.

I again find no case law that would have put the defendants on notice that plaintiff was speaking as a citizen in these e-mails instead of as an employee.  The thrust of the precedent from within the Second Circuit is the other way.  In the Brtalik case, for instance, the plaintiff wrote a number of letters to administrators charging his colleagues with misconduct.  Brtalik, 2010 WL 3958430, at *1.  He alleged that a colleague had lost a key to a projection booth in a school, creating a risk of injury to students who might enter the booth as well as a possibility of theft.  Moreover, he charged, his superiors often asked him to make copies of copyrighted videotapes, an unlawful act he declined to perform.  Id.

The court held that the plaintiff had made his complaints as an employee, not as a citizen.  The statements, the court wrote, all concerned "[p]laintiff's work environment, and his working

35

relationship with [a defendant] and other District employees."
Id. at 6.  It reasoned that reporting on his colleagues' failures
to properly discharge their responsibilities fell within the
plaintiff's duties as a government employee.

Here, as in Brtalik, plaintiff's complaints chiefly concern
his "work environment" and his "working relationship" with the
defendants.  See id.  Plaintiff thought it was "wrong to require
that [he] write health certificates when the 'University' no
longer pa[id] for his licenses."  ECF No. 42, Ex. 8 at 3.
Baccanale was hired by a "rigged search committee."  Id.  Stone,
Anderson, and Baccanale "continued a practice of not promptly
returning [plaintiff's] annual consulting requests."  Id. at 4.
Baccanale "often [did] not reply to submitted drafts of assigned
reports."  Id. at 5.  These are the complaints of a dissatisfied
employee, not of a concerned citizen.

Plaintiff points out that in these e-mails, he went outside
the chain of command and over the heads of his bosses.  He is
correct to suggest that this tends to support the conclusion that
he did not speak as an employee.  But plaintiff's decision to
contact OACE instead of speaking to an immediate superior is by
no means dispositive.  See, e.g., Anemone, 629 F.3d at 116
("[Plaintiff] argues that once he went 'outside the chain of
command' . . . his subsequent discussions . . . were protected. .
. . [I]t would be incongruous to interpret Garcetti, a case

36

concerned with allowing the government to control its employees
within their jobs, as giving broader protections to disobedient
employees who decide they know better than their bosses how to
perform their duties." (internal quotation marks and citations
omitted)).

The Garcetti inquiry is driven by facts, and the plaintiff
has identified no case law showing that on these facts it was
clear that he spoke as a citizen.  Neither can I find any, and
Brtalik points in the opposite direction.  As a result, the
defendants could have read plaintiff's May 2007 e-mail and its
December 2005 attachment and reasonably concluded that he was
speaking as an employee.

Furthermore, these e-mails do not relate to a matter of
public concern.  Here Ezekwo more or less controls.  In that
case, the plaintiff was a resident at a New York hospital who
received a number of poor evaluations from superiors.  During her
residency she wrote prolifically about problems within her
workplace, covering such topics as her superiors' poor
management, their failure to competently evaluate her
performance, their lack of teaching ability, the scarcity of
opportunities to perform surgery, and retaliation against her
based on her race, gender and criticism of the program.  Ezekwo,
940 F.2d at 777-78.  She directed her complaints to her
supervisors, to her collective bargaining agent and to the

37

hospital's equal employment opportunity officer.  <u>Id</u>.  After
leaving the program, she brought suit alleging that the
defendants had retaliated against her based on protected speech.

   Not so, held the Second Circuit.  The plaintiff's grievances
had been a calculated response to her poor evaluations, not an
attempt to debate public issues.  "The mere fact that one or two
of Ezekwo's comments could be construed broadly to implicate
matters of public concern," wrote the Court, "does not alter the
general nature of those statements."  <u>Id</u>. at 781.  And in
general, "[h]er complaints were personal in nature and . . .
related to her own situation within the . . . residency program."
<u>Id</u>.  The plaintiff was "not on a mission to protect the public
welfare. . . . [r]ather, her primary aim was to protect her own
reputation and individual development as a doctor."  <u>Id</u>.  <u>See
also Ruotolo v. City of New York</u>, 514 F.3d 184, 189-90 (2d Cir.
2008) ("Ruotolo's lawsuit sought to redress his personal
grievances.  It did not seek to advance a public purpose. . . .
The acts of alleged retaliation . . . bear upon the circumstances
. . . of his employment, such as reassignment, transfer, time
off, and discipline.").

   So too in this case.  Though several of plaintiff's remarks,
"construed broadly," might "implicate matters of public concern"
– the proper handling of controlled substances, the humane
treatment of animals – his e-mails as a whole seek relief for

personal grievances.  The thrust of his messages was that his
career had stalled because his unqualified supervisors had it out
for him and OACE could remedy the situation by offering him a new
position.  The overriding concern in these e-mails is plaintiff's
career, not the appropriate storage of veterinary drugs or the
right way to euthanize a rabbit.

This is not to say that plaintiff's motivation in speaking
is dispositive.  The law makes clear that it is not.  <u>Huth</u>, 598
F.3d at 74.  It is plaintiff's private aim in combination with
the personal nature of his complaints and the merely incidental
references to drug registration and animal welfare that must be
considered.  Given this combination of factors, it must be
concluded the e-mails air private grievances, not public issues,
and as a result they do not support a First Amendment claim.

2. <u>June 21, 2008 E-mail</u>

The plaintiff's final e-mail alerted a member of OACE to
trouble with the OARS mouse cages.  In two cages, the Autowater
system was not functioning properly.  As a result, mice in those
cages had become dehydrated and tried to eat each other.  ECF No.
42, Ex. 9 at 1.  Plaintiff told the OACE member about the mice
and advised that OARS did not have enough technicians to
adequately monitor them.

As discussed in Part III.D., *supra*, plaintiff's reporting
duties after January 2006 are disputed.  And it is not obvious

that his concerns about the mice (unlike his concerns about
rabbit euthanasia) were incidental to his duties as a Clinical
Veterinarian.  His e-mail indicates that he was "called in [to
the lab]" because of "two dehydrated mouse cages," but the record
does not clearly demonstrate that he was under a duty to inform
OACE of his observations and opinions.  In light of this, it
cannot be concluded as a matter of law that in this instance
plaintiff spoke as an employee.

The defendants, however, could reasonably have concluded
that plaintiff's e-mail did not relate to a matter of public
concern.  Plaintiff argues that his speech concerned the public
because it touched on issues of animal welfare.  But the e-mail
describes an isolated incident in which mice in two cages became
dehydrated and includes one sentence attributing the occurrence
to a larger issue.  Id. ("To me, OARS is short staffed on
technicians . . . to monitor the mice, etc.").  This is not an
instance in which the plaintiff sought to expose or correct
"pervasive" or "systemic" problems within OARS.  See Saulpaugh, 4
F.3d at 143 (quoting Yatvin, 840 F.2d at 420).  Nor is it a case
in which he tried at length to bring widespread abuses in the lab
to public attention.  See Rambaldi, 2003 WL 2374427, at *8.  It
is rather an occasion, doubtless similar to thousands that arise
within public institutions from day to day and week to week, in
which the plaintiff mentioned in passing a troubling but

resolvable issue and suggested how to fix it.

Pickering reflects the simple truth that if government is to go on, not every remark about the functioning of its institutions can carry constitutional significance.  I need not decide if this particular remark is among the set that does.  When plaintiff sent his last e-mail to OACE, no case clearly established that his observations about Autowater systems and his opinion on OARS staffing related to a matter of public concern.  The defendants are therefore protected by qualified immunity.

IV. Conclusion

Accordingly, the defendants' motion for summary judgment is hereby granted.

So ordered this 29th day of March 2015.

                        /s/
                   Robert N. Chatigny
               United States District Judge

41